21-1678-(L)
*United States v. Weigand (Akhavan)*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of December, two thousand twenty-two.

PRESENT:

> PIERRE N. LEVAL,
> DENNY CHIN,
> EUNICE C. LEE,
> *Circuit Judges*.

-----------------------------------------------------------------

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant*,

v.

JAMES PATTERSON,

*Defendant*,

RUBEN WEIGAND, AKA SEALED DEFENDANT 1,

*Defendant-Appellant*,

HAMID AKHAVAN,

*Defendant-Appellant-Cross-Appellee*.

No. 21-1678-cr (L), 21-1708-cr (Con), 21-2214-cr (Con), 21-2466-cr (XAP)

---

For Appellee-Cross-Appellant:                    EMILY DENINGER, Assistant
                                                 United States Attorney (Nicholas
                                                 Folly, Tara M. La More, Won S.
                                                 Shin, Assistant United States
                                                 Attorneys, *on the brief*), *for*
                                                 Damian Williams, United States
                                                 Attorney for the Southern District
                                                 of New York, New York, NY.

For Defendant-Appellant:                         MICHAEL H. ARTAN, Los
                                                 Angeles, CA.

For Defendant-Appellant-Cross-Appellee:          DEREK L. SHAFFER (Christopher
                                                 Tayback, William A. Burck, *on
                                                 the brief*), Quinn Emanuel
                                                 Urquhart & Sullivan, LLP, Los
                                                 Angeles, CA,
                                                 Washington, DC.

                                                 IRA ROTHKEN (Jared Smith, *on
                                                 the brief*), Rothken Law Firm,
                                                 Novato, CA.

Appeal from a judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED** in part and **VACATED** and **REMANDED** in part.

Defendant-Appellant Ruben Weigand and Defendant-Appellant-Cross-Appellee Hamid Akhavan ("Defendants") appeal from their convictions after jury trial on one count of conspiracy to obtain money from a financial institution by false representations. 18 U.S.C. §§ 1349, 1344.

The government cross-appeals from the district court's reduction of the amount of the forfeiture it imposed on Defendant Akhavan. Weigand's and Akhavan's convictions are the product of a scheme whereby Defendants, principals at Eaze, a major on-demand marijuana delivery service, deceived United States banks and other financial institutions into processing credit card and debit card payments for the purchase and delivery of marijuana products. Defendants argue that there was insufficient evidence of materiality and intent to convict them, that the jury instructions were erroneous and prejudicial, and that the decision to allow a witness to testify remotely violated their Sixth Amendment Confrontation Clause rights. Weigand also argues that he was prejudiced by the district court's rulings on various evidentiary matters. The government cross-appealed challenging the district court's reduction of Akhavan's forfeiture liability from $17,183,114.57 to $103,750. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the arguments presented on appeal. We first address the three challenges brought by both Defendants, then Weigand's additional evidentiary claims, and then the government's forfeiture argument.

## I.      Sufficiency of the Evidence

We review *de novo* the sufficiency of the evidence underlying a conviction and uphold the "conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted). In evaluating such challenges, we "view the evidence in the light most favorable to the government, deferring to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence." *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006). "We remain mindful that the government is entitled to

3

prove its case solely through circumstantial evidence." *United States v. McKenzie*, 13 F.4th 223, 238 (2d Cir. 2021) (internal quotation marks omitted).

### 1. Materiality

Defendants first argue that the government failed to prove materiality. A defendant may be convicted of bank fraud under 18 U.S.C. § 1344 by proof that he

> knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344. "[P]roof of the violation of either subsection is sufficient to support a conviction." *United States v. Crisci*, 273 F.3d 235, 239 (2d Cir. 2001). To sustain a conviction under either subsection, the government must prove that the defendant made material misrepresentations. *Neder v. United States*, 527 U.S. 1, 20–26 (1999). "To be 'material' means to have probative weight, i.e., [to be] reasonably likely to influence the bank in making a determination required to be made." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (internal quotation marks omitted). In other words, "would the misrepresentation actually *matter* in a *meaningful way* to a rational decisionmaker?" *Id.* at 86.

Defendants claim that the government did not prove materiality because it failed to establish that banks actually consider the type of information misrepresented by Defendants, which included names, locations, descriptors, and category codes for merchants for each transaction. Defendants urge that, to the contrary, the defense introduced evidence that banks do not consider the type of evidence misrepresented by Defendants in making any determinations. Specifically, Defendants argue that the evidence showed that, even had the banks been provided with accurate

4

information, they would have processed the marijuana transactions anyway. We are not persuaded. The government introduced substantial evidence, including bank officer testimony and bank rules and regulations, supporting the inferences both that issuing banks would not knowingly have processed marijuana transactions and that, in deciding whether to process the transactions, they would have relied on the type of information falsified by Defendants. Based on that evidence, a rational factfinder could have determined that banks do consider the type of information falsified by Defendants and that accurate information would have been reasonably likely to have influenced the banks. *See Calderon*, 944 F.3d at 86 (rejecting the defendants' argument that they "needlessly modified [bills of lading]" and holding that the materiality requirement was met because "the Government offered substantial evidence at trial . . . that the banks could have and would have rejected the bills of lading had they not been altered" (emphasis omitted)).

2. Intent

Second, Defendants argue that the government failed to establish that Akhavan and Weigan intended to harm the banks. We reject this argument because § 1344(2) does not require an intent to harm; it requires an intent to take bank property. *See Loughrin v. United States*, 573 U.S. 351, 356–57 (2014). Defendants' error is in conflating the requirements for conviction under § 1344(1)—scheme to defraud—with those for conviction under § 1344(2). While the former requires proof of intent to defraud, the latter does not. *Id.* at 357 (noting that the argument that § 1344(2) requires intent to defraud "becomes yet more untenable in light of the rest of the bank fraud statute . . . because the first clause of § 1344, as all agree, includes the requirement that a defendant intend to 'defraud a financial institution'"). Because there was sufficient evidence to convict Defendants under § 1344(2) and proof of a violation of either subsection is sufficient to

5

support a conviction, we need not determine whether there was sufficient evidence of intent to defraud. *See Crisci*, 273 F.3d at 239.

## II.      Jury Instructions

Where a defendant timely objects to a district court's jury instructions, we review the instruction *de novo* "and will vacate a conviction for an erroneous charge unless the error was harmless." *United States v. Nouri*, 711 F.3d 129, 138 (2d Cir. 2013). If the defendant fails to timely object, we review the instructions for plain error and have "discretion to reverse only if the instruction contains (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (internal quotation marks omitted). "If those three conditions are met, a court has discretion to correct the error if it seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted, modification in original).

Defendants challenge three of the district court's jury instructions: the materiality instruction, the intent instruction, and the curative instruction issued after Akhavan's closing argument.[1] All three challenges fail.

In its jury charge, the district court defined a "material fact" as "a fact that a reasonable banker would be reasonably likely to consider in making a decision authorizing a bank transaction involving the transfer of money or property." Joint App'x 2397. The court further explained,

> [f]or example, if a perpetrator made misrepresentations designed to make marijuana purchases look like the purchases of other goods, the misrepresentations would be material if, had the banker known

---

[1] Though the parties dispute whether the Defendants timely objected to the district court's materiality jury instructions, we need not resolve the issue because, even assuming the Defendants timely objected, their argument is without merit.

that the purchasers—that the purchases were disguised and really were for marijuana, such knowledge would be reasonably likely to influence a reasonable banker in deciding whether to authorize the purchases.

*Id.* Defendants claim this "example" misdirected the jurors because it presupposed that, but for the misrepresentations, a reasonable banker would have been able to tell that the transaction related to marijuana. Therefore, they argue that, contrary to defense evidence, the example suggested that banks would always know and care that a transaction involved marijuana if provided with accurate transaction information. We do not agree.

"In reviewing a jury instruction, we examine not only the specific language that the defendant challenges but also the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Al Kassar*, 660 F.3d 108, 127 (2d Cir. 2011) (internal quotation marks omitted). Here, the district court stated the correct materiality standard: "a material fact . . . [is] a fact that a reasonable banker would be reasonably likely to consider in making a decision authorizing a bank transaction involving the transfer of money or property." Joint App'x 2397. And the "example" that followed accurately described a scenario in which a misrepresentation would be material, without directing the jury that it had to find the hypothetical facts described. Thus, we discern no error in the district court's materiality instruction, when taken as a whole.

Weigand and Akhavan also argue that the district court's instructions improperly conflated the elements of § 1344(1) and (2) by suggesting that the mere intent to facilitate the transactions, rather than an intent to harm, would satisfy the intent requirement. But, as discussed *supra*, § 1344(2) has no such intent to harm requirement. *See United States v. Lebedev*, 932 F.3d 40, 49

7

(2d Cir. 2019) ("Subsection (2) . . . does not require that 'a defendant have a specific intent to deceive a bank.'" (quoting *Loughrin*, 573 U.S. at 356–57)). And the district court's instruction that the jury must find Defendants acted with "an intent to use misrepresentations to obtain money or property from a federally insured bank" properly described the requisite level of intent for § 1344(2). Joint App'x 2937; *see also Loughrin*, 573 U.S. at 355–56 (describing § 1344(2)'s requirements).

Lastly, Defendants argue that the curative instruction the court issued after Akhavan's closing argument misstated the law.[2] Defendants were charged with an ongoing scheme, yet defense counsel suggested in closing that misinformation was material only if it might reasonably affect the banks' behavior as to each individual transaction at the time it was made. This position takes too cramped a view of the materiality requirement, almost veering toward a reliance argument, *i.e.*, that misinformation is material only if it actually influenced the banks' authorization of each transaction. *See Neder*, 527 U.S. at 24–25 (noting that reliance "[h]as no place in the federal fraud statutes"). The district court's instruction was proper to clear up any potential juror confusion. *See United States v. White*, 552 F.3d 240, 250 (2d Cir. 2009) (holding that curative instruction was correct where it "refocused the jury on the [proper] elements"); *United States v. Civelli*, 883 F.2d 191, 195 (2d Cir. 1989) ("If a supplemental charge is legally correct,

---

[2] The curative instruction directed the jury that:

> It is not necessary that a misrepresentation made in connection with a particular transaction be reasonably likely to affect the decision to authorize that particular transaction at that particular time. Rather, what is charged here is an ongoing scheme to defraud, including a course of misrepresentations over a period of time through a pattern or a course of deceptive conduct. So you need to look at the whole picture.

Joint App'x 2936–37.

the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given.").

### III. Confrontation Clause

"Alleged violations of the Confrontation Clause are reviewed *de novo*, subject to harmless error analysis." *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006). We review the factual finding that a witness is unavailable for clear error and review for abuse of discretion a court's ultimate decision whether to permit testimony by two-way video. *United States v. Gigante*, 166 F.3d 75, 80–82 (2d Cir. 1999).

Defendants argue that the district court's decision to allow Martin Elliot, Visa's representative, to testify remotely via two-way video violated their Sixth Amendment right to face-to-face confrontation. They first argue that this Court's decision in *Gigante*, which held that in exceptional circumstances testimony of an unavailable witness via two-way video satisfied the Confrontation Clause, does not withstand *Crawford v. Washington*, 541 U.S. 36 (2004). In the alternative, they argue that *Gigante*'s standard for testimony via two-way video was not met here. We address each argument in turn.

Contrary to Defendants' contention, *Crawford* does not stand in tension with *Maryland v. Craig*, 497 U.S. 836 (1990), or *Gigante*. Both *Craig* and *Gigante* hold that, in limited circumstances, something less than in-court testimony may comply with the Confrontation Clause. *See Craig*, 497 U.S. at 857 (holding that the Confrontation Clause was satisfied by one-way video testimony). In *Gigante*, this Court concluded that a trial court may allow testimony via two-way video provided that the court make a finding that there are exceptional circumstances (which included in that case the unavailability of the witness), and that testimony via two-way video would

9

further the interests of justice. 166 F.3d at 81. Thus, *Gigante*, like *Craig*, concerned whether video testimony may vindicate Confrontation Clause rights that undeniably exist. *Crawford*, on the other hand, answered whether the Confrontation Clause is implicated in the first instance by testimonial, out-of-court statements notwithstanding other indicia of reliability. 541 U.S. at 68–69. Because *Crawford* concerns an entirely different question than *Gigante* and *Craig*, it does not stand in tension with those cases. The district court rightly applied *Gigante* in determining whether Elliott could testify via two-way video.

Furthermore, we reject Defendants' argument that, even if *Gigante* is still good law, the district court's *Gigante* analysis was mistaken because there were no exceptional circumstances justifying testimony by two-way video. The district court determined that Elliot was unavailable because he could not travel across the country at a time when vaccines were not yet easily obtained without subjecting himself to a substantial risk of contracting COVID-19, which, given his age and comorbidities, could well result in serious illness or death. The court found that the need to prevent serious illness and death and to protect his family, including his 83-year-old mother-in-law for whom he was the primary caretaker, constituted exceptional circumstances warranting use of two-way video. Reviewing the district court's factual findings under the clear error standard, we conclude that the district court did not err in finding Elliott unavailable or in finding exceptional circumstances.

Nor did the district court abuse its discretion in permitting two-way video testimony pursuant to *Gigante*. By permitting Defendants, defense counsel, the questioner, the judge, and the jurors all to see and be seen by the witness, two-way video safeguarded "the reliability of the evidence by subjecting it to rigorous adversarial testing." *Craig*, 497 U.S. at 857. Although two-

way video testimony "should not be considered a commonplace substitute for in-court testimony by a witness," allowing two-way video testimony amidst an unprecedented global pandemic, where the witness was unvaccinated and risked substantial illness or death from COVID-19, "further[ed] the interest of justice." *Gigante*, 166 F.3d at 81.

### IV. Weigand's Evidentiary Claims

A district court's decision to exclude expert testimony, as well as other evidentiary rulings, is reviewed for abuse of discretion and reversed only where "the decision to admit or exclude evidence was manifestly erroneous." *United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015) (internal quotation marks omitted). Even if this standard is met, the Court will "still affirm if the error was harmless." *Id.* (internal quotation marks omitted).

Weigand challenges the district court's exclusion of evidence of lack of pecuniary loss, exclusion of an expert witness, and exclusion of post-arrest statements. In all three instances, the district court acted within its discretion. Nonetheless, we need not delve into the substance of Weigand's challenges because, even assuming an abuse of discretion, the evidentiary errors were harmless against the totality of the evidence presented in the case *See United States v. Casamento*, 887 F.2d 1141, 1180 (2d Cir. 1989) ("[T]he properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [error] so insignificant by comparison, that it is clear beyond a reasonable doubt that [the error] was harmless error." (quoting *Parker v. Randolph*, 442 U.S. 62, 70–71 (1979)) (alteration in *Casamento*)).

### V. Akhavan's Forfeiture

This Court "determine[s] *de novo* 'whether a fine is constitutionally excessive,' although [it] must accept the District Court's factual findings 'unless clearly erroneous.'"[3] *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016) (quoting *United States v. Bajakajian*, 524 U.S. 321, 336 & n.10 (1998)).

In *Bajakajian*, the Supreme Court established the inquiry for determining whether a financial penalty is excessive under the Eighth Amendment. 524 U.S. at 335. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334. In interpreting *Bajakajian*, this Court has instructed consideration of the following, non-exhaustive "*Bajakajian* factors":

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Viloski*, 814 F.3d at 110. Courts may also consider whether the forfeiture would deprive the defendant of their livelihood. *Id.* at 110.

In its cross-appeal, the government challenges the district court's decision to reduce Akhavan's forfeiture amount from $17,183,114.57 to $103,750. On June 18, 2021, the district court orally sentenced Akhavan to 30 months' imprisonment, a fine of $100,000, and forfeiture of $17,183,114.57, but it did not enter a final written judgment at that time.[4] It subsequently granted

---

[3] Neither Akhavan nor the government appear to dispute that the forfeiture at issue is a "fine" within the meaning of the Excessive Fines Clause.

[4] The government had argued at sentencing that the district court should impose forfeiture in the amount of $156,225,211.61, reflecting the gross proceeds of Akhavan's scheme, or in the alternative, forfeiture of $17,183,114.57, reflecting the amount Akhavan charged for his services.

Akhavan's request for an evidentiary hearing and, following the hearing, granted Akhavan's request for supplemental briefing on forfeiture. On August 30, 2021, by written opinion, the district court found that the government had established by the required preponderance of the evidence that Akhavan "obtained" $17,183,114.57 for purposes of forfeiture under 18 U.S.C. § 982(a)(2). Nonetheless, because such a forfeiture would constitute an excessive fine in violation of the Eighth Amendment, the court determined that it could not be imposed consistent with *Bajakajian*. Consequently, the court only imposed a forfeiture of $103,750, the value of the Eaze stock Akhavan received as part of the payment for his services.

In weighing the *Bajakajian* factors, the court observed as to the first and fourth factor—essence of the crime and nature of the harm—that though Akhavan perpetrated "a serious fraud," from an economic standpoint, "no one lost money." Special App'x at 17. Instead, "[t]he banks, in fact, made money." *Id.* at 18. Of all the factors, however, the district court appeared to give particular weight to the third: the maximum possible sentence and fine. The court noted that under § 1344 the "maximum sentence was 360 months' imprisonment; the maximum fine was $1 million," and emphasized that a "$17 million forfeiture order would be 17 times the maximum fine possible under § 1344 and would be 170 times the amount of the fine actually imposed in this case." *Id.* at 17-18. Having made these observations, the court stated that a $17 million forfeiture "is wholly out of proportion to the maximum and actual fine." *Id.* at 18. Following its findings on all four factors, the court said that "the overarching question . . . remains whether a $17 million forfeiture order is grossly disproportional to the gravity of Akhavan's offense" and reiterated that "a $17 million forfeiture order is seventeen times the maximum fine and 170 times the actual fine

13

imposed in this case." *Id.* at 19. The court then concluded that a forfeiture amount of $17 million would be grossly disproportionate. *Id.* at 20.

We are persuaded by the government's argument that, on the record before us, the district court's reasoning as to the third *Bajakajian* factor stands in tension with this Court's caselaw. In particular, our precedents suggest that a forfeiture amount is not necessarily greatly disproportionate where it equals the proceeds of the illegal scheme, even if it significantly exceeds the maximum statutory fine. In *United States v. Castello*, for example, we ordered the district court to reimpose a $12 million forfeiture order where the maximum penalty was five years' imprisonment and the maximum statutory fine was $250,000, but where the defendant's fraud involved more than $200 million in unreported funds.[5] 611 F.3d 116, 121–24 (2d Cir. 2010). Similarly, in *United States v. Bonventre*, we observed that where "forfeiture ordered is in an amount equivalent to the undisputed, actual proceeds of the fraud," we cannot conclude "that the order was grossly disproportionate to the gravity of [the] offense." 646 F. App'x 73, 91–92 (2d Cir. 2016) (summary order) (upholding a $19 million forfeiture order for an offense with a statutory maximum of $10 million); *see also United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008) (upholding a $22 million forfeiture order where evidence showed the amount roughly equaled the total funds defendants unlawfully transmitted). Thus, because a $17 million forfeiture is equivalent to Akhavan's proceeds from the fraud, the fact that a forfeiture in that amount would

---

[5] Furthermore, though the district court stated that Akhavan's scheme generated no articulable loss, our analysis in *Castello* suggests that the harm inquiry should not be so narrow. 611 F.3d at 124 (noting that defendant's filing of fraudulent currency transactions reports "helped his customers evade taxes, cash fictitious checks, and commit securities fraud"). Marijuana is a federally illegal narcotic. *See* 21 U.S.C. § 812(c)(Schedule I)(c)(10). Akhavan's scheme resulted in banks processing transactions they would not have otherwise processed and allowed others to take actions that, absent the scheme, "the government could have prevented or prosecuted." *Castello*, 611 F.3d at 124. Though not articulable in dollars, those consequences are nonetheless a harm.

14

greatly exceed § 1344's statutory maximum fine does not, in and of itself, compel a finding of unconstitutionality. Accordingly, we vacate the district court's forfeiture judgment and remand for reconsideration in light of this Court's ruling.

In reapplying all the *Bajakajian* factors, the district court may well again conclude that a $17 million forfeiture would be greatly disproportionate. In that case, we emphasize that the $17 million forfeiture may only be "discounted by whatever amount is necessary to render the total amount not grossly disproportional to the offense." *Castello*, 611 F.3d at 120 (internal quotation marks omitted) ("[t]hus a forfeiture of zero would be proper only if a forfeiture of even $1 would be grossly disproportional to the offense of conviction").

## VI. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in part and **VACATED** and **REMANDED** in part.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court